UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
HAMMOND DIVISION AT LAFAYETTE

NICOLE E. MARSHALL          )
                                           )
      Plaintiff,           )
                                           )
      v.                )      Case No.:  4:12-CV-075 JD
                                         )
CAROLYN W. COLVIN,         )
Acting Commissioner of Social Security,[1]  )
                                         )
      Defendant.         )

## OPINION AND ORDER

On December 18, 2012, Plaintiff Nicole Marshall filed her Complaint in this Court
seeking review of the final decision of the Defendant Commissioner of Social Security
("Commissioner").  [DE 1.]  The Commissioner filed an answer on March 28, 2013.  [DE 12.]
On June 24, 2013, Marshall filed her opening brief [DE 22], to which the Commissioner
responded on December 2, 2013 [DE 34].  Marshall did not file a reply, and the time to do so has
lapsed.[2]  Accordingly, the matter is now ripe for ruling.

## I.  Procedural History

In December 2006, Marshall filed an application for disability insurance benefits.  (Tr.
96–100.)  Her application was denied on March 22, 2007, and again on reconsideration on
August 10, 2007.  (Tr. 53–54.)  On October 7, 2009, a hearing was held via video conference

---

[1] Carolyn W. Colvin became the acting Commissioner of Social Security on February 14, 2013.  Pursuant to Fed. R.
Civ. P. 25(d), Colvin is substituted for Michael J. Astrue as the Defendant in this action.  No further action needs to
be taken as a result of this substitution.  42 U.S.C. § 405(g) ("[a]ny action instituted in accordance with this
subsection shall survive notwithstanding any change in the person occupying the office of Commissioner of Social
Security or any vacancy in such office.").

[2] Counsel for Marshall missed the original deadline of December 16, 2013, for filing the reply brief.  On December
17, 2013, she requested a one-week extension of time to file the reply.  [DE 35.]  That motion was granted and
Marshall was given leave to file a reply by December 23, 2013.  [DE 36.]  Despite the extension, Marshall did not
file her reply brief.

before Administrative Law Judge Gregory M. Hamel. (Tr. 27–52.) On April 9, 2010, the ALJ

issued a decision denying the claim for disability insurance benefits. (Tr. 8–26.) The Appeals

Council denied the request for review (Tr. 1–5) and Marshall filed a complaint in the Northern

District of Indiana seeking judicial review of the Commissioner's final decision.[3] The parties

stipulated to a sentence four remand in order to allow an ALJ to conduct a more detailed analysis

of the effect of Marshall's limitations in concentration, persistence, and pace upon her ability to

perform work-related activities. The remand was granted by the Court. (Tr. 874–79.) After the

remand, the Appeals Council remanded the case for further proceedings before an ALJ. (Tr.

873.)

In August 2010—just before Marshall had filed the earlier complaint in this Court—she

filed an additional application for disability insurance benefits and an application for

supplemental security income.[4] (Tr. 920–29.) The record does not include any initial decision

on those applications, but Marshall attached to her opening brief documentation that the

applications were denied on reconsideration on March 30, 2011. [DE 22-2.]

On May 31, 2012, a hearing on both the 2006 and 2010 applications was held before

Administrative Law Judge Edward P. Studzinski.[5] (Tr. 778–819.) On August 20, 2012, the ALJ

issued a decision denying both the claims for disability insurance benefits and supplemental

security income. (Tr. 736–63.) The record does not reflect that Marshall requested review by

the Appeals Council of the ALJ's 2012 decision. Accordingly, the decision—at least with

---

[3] That case was number 4:10-CV-67, before Judge Robert L. Miller, Jr.

[4] Based on the record, it appears the 2010 application was Marshall's first application for supplemental security income.

[5] While the record does not explicitly state so, it appears that the 2006 and 2010 applications were consolidated to be heard in a single hearing, consistent with 20 C.F.R. §§ 404.952, 416.1452.

respect to the 2006 application—became a final decision of the Commissioner on the sixty-first day following the ALJ's decision.  20 C.F.R. § 404.984(d).[6]

## II.  Facts

Marshall was born on August 23, 1975; therefore, she was thirty-six years old on the date the ALJ rendered his decision.  (Tr. 754, 788.)  She has the equivalency of a high school education and has past relevant work as a wire harness assembler.  Marshall alleged a disability onset date of June 2, 1998.  (Tr. 96, 920, 924.)  With respect to her claim for disability insurance benefits, she met the insured requirements through March 31, 2004. (Tr. 105.)

### A.    Medical Evidence of Physical Impairments

Medical records of Marshall's physical impairments date to approximately 1997.  On January 21, 1997, Marshall presented to the Arnett Clinic complaining of stomach pains and diarrhea.  Dr. John Geneczko's impression indicated possible Irritable Bowel Syndrome ("IBS"). (Tr. 364–65.)  Subsequent tests did not show any abnormalities, and the impression included a negative upper gastrointestinal series and normal small bowel examination.  (Tr. 370.)

In May 1997, Marshall complained of knee pain.  (Tr. 361–62.)  An MRI of the right knee conducted on May 16, 1997, revealed contusions of the medial femoral condyle and medial tibial plateau, as well as normal meniscal and ligamentous structures.  (Tr. 362.)  On May 21, 1997, Marshall presented to Arnett Clinic complaining of swelling, pain, and popping of her left knee.  (Tr. 361.)  Dr. Jeffrey McIntosh assessed bilateral patellofemoral malalignment and

---

[6] This case has a unique procedural history, in that some of the claims before the ALJ (the 2006 application) were considered following a remand by this Court.  Others (the 2010 applications) were heard by the ALJ after an initial denial and denial on reconsideration.  Different finality rules apply to the 2006 and 2010 applications due to their differing procedural histories.  Neither party has raised the issue of whether the ALJ's decision is actually a "final decision of the Commissioner of Social Security" under section 405(g).  However, the Court has an independent need to determine its jurisdiction and will consider the issue below.

recommended a plan that included bracing, aggressive rehabilitation, and a short course of anti-inflammatory medication.  (Tr. 361.)

On April 2, 1998, Marshall presented to Arnett Clinic complaining that she had been experiencing left hip pain for the prior several months.  (Tr. 208.)  Dr. Daniel Daluga's notes indicate potential synovitis of the left hip with some trochanteric inflammation.  (Tr. 208.)  An MRI conducted on April 16, 1998, revealed avascular necrosis ("AVN") of the left hip, which had been unresponsive to anti-inflammatories.  (Tr. 207.)  Accordingly, Dr. Daluga prescribed Lortab and recommended that Marshall undergo a left hip decompression, which Marshall did on April 28, 1998.  (Tr. 193, 207.)  Notes from a May 7, 1998, follow-up appointment indicated that Marshall had excellent range of motion and that her wound was well-healed.  (Tr. 205.)  By July, Marshall's condition had worsened, and doctors noted collapse of the femoral head.  (Tr. 202–03, 227.)  Consequently, Marshall underwent a left total hip arthroplasty on August 4, 1998, and was thereafter discharged in fair condition.  (Tr. 216–18.)  Notes from appointments and physical therapy sessions in the months after surgery indicate that Marshall responded well to the procedure and physical therapy and that she was happy with her progress.  (Tr. 199–200, 373–80.)

On January 5, 1999, Dr. Mark Griffith examined Marshall and noted myofascial pain syndrome of the lumbosacral region and thoracic back, secondary to mechanical factors associated with Marshall's antalgic limp.  (Tr. 336.)  Dr. Griffith recommended physical therapy; therefore, Marshall presented to Sagamore Rehabilitation Center on January 8, 1999.  (Tr. 336, 390.)

Between January 1999 and March 1999, Marshall repeatedly complained of hip pain; however, tests indicated excellent range of motion in the hip and no dislocation or fracture.  (Tr.

240–41, 329, 333, 356.)  On April 9, 1999, Marshall presented to St. Elizabeth Hospital Medical Center complaining of left leg swelling, but a left lower extremity ultrasound ruled out the possibility of deep venous thrombosis ("DVT").  (Tr. 237.)  Throughout the following year, Marshall continued to complain of hip and leg pain, and tests yielded normal results; the prosthesis was in a satisfactory position with no evidence of loosening or fracture.  (Tr. 228–29, 242, 579–80.)

On May 4, 2000, Marshall presented to Arnett Clinic complaining of pain in her left hip and left ankle after attempting to run after her son.  (Tr. 392–93.)  An x-ray of the left heel revealed no abnormalities.  (Tr. 392–93.)  Dr. Daluga noted plantar fasciitis of the left foot and adductor strain and recommended stretching as well as weight loss.  (Tr. 392.)  On March 22, 2001, Marshall presented with an antalgic gait to Arnett Clinic complaining of problems with plantar fasciitis.  (Tr. 400.)  Dr. Daluga placed Marshall in a cast, and the record does not indicate any further complains regarding the plantar fasciitis for the remainder of that year.

Marshall gave birth to twins on February 7, 2002.  (Tr. 256.)  Both prior to and after giving birth, Marshall experienced gestational diabetes mellitus, and doctors recommended that she change her diet.  (Tr. 256, 407, 409–10.)  Later that year, Marshall presented to Lafayette Home Hospital complaining of a migraine headache and abdominal pain.  (Tr. 281.)  The notes of that visit comment that Marshall has "a history of recurrent headaches and this headache seems familiar."  (Tr. 281.)  On June 22, 2002, Dr. John Woods diagnosed Marshall with acute cephalgia and umbilical hernia and directed her to follow-up with Dr. Jerry Jefson, a surgeon at the hospital.  (Tr. 282.)  On July 1, 2002, Marshall underwent an exploratory laparotomy and hernia repair.  (Tr. 268–71.)  The Court could not locate any further complaints regarding the hernia in the record.

On March 7, 2003, Marshall presented to Arnett Clinic complaining of left hip pain after slipping on ice, but an x-ray did not reveal any abnormalities. (Tr. 448.) On August 12, 2003, Marshall presented to Arnett Clinic with several complaints, including pain in her chest, neck, back, and foot. (Tr. 432.) An EKG yielded normal results and an x-ray of the cervical spine did not show any acute osseous injury. (Tr. 291, 432.) Dr. Leslie Cooper attributed Marshall's neck pain to probable muscle spasms and offered to send Marshall to physical therapy; however, Marshall refused therapy. (Tr. 433.) In response to Marshall's complaint of foot pain, Dr. Cooper encouraged her to get shoes that fit her properly and continue prescribed medication. (Tr. 426.)

On October 1, 2003, Marshall saw Dr. Cooper for complaints of low back pain, and Dr. Cooper prescribed Lortab, encouraged Marshall to lose weight, and recommended physical therapy. (Tr. 415.) Views of the lumbar and cervical spines, taken on October 7, 2003, revealed an "[e]ssentially normal lumbar spine" and minimal degenerative change of the cervical spine. (Tr. 444.) One week later, an MRI of Marshall's lumbar spine was performed and yielded normal results. (Tr. 290.) Thereafter, on October 23, 2003, Marshall contacted Arnett Clinic requesting "something for pain" and the clinic ordered physical therapy. (Tr. 420.)

On July 15, 2004, Marshall presented to Lafayette Home Hospital's emergency room complaining of left knee pain, swelling, and numbness. (Tr. 725.) An x-ray of the knee yielded normal results and Dr. Anthony Steele diagnosed Marshall with left knee pain with effusion. (Tr. 727.) In May and June 2006, Marshall complained of hip pain. (Tr. 569, 717–18.) However, x-rays of Marshall's hip were unremarkable with no evidence of acute disease or avascular necrosis. (Tr. 570, 718.)

On August 21, 2006, Marshall presented to Indiana Spine Center complaining of pain that radiated into her right hip. (Tr. 488.) A radiograph of the lumbar spine was grossly normal with mild disc space collapse at L5-S1. (Tr. 489.) An MRI of the lumbar spine was conducted the following day and revealed that there was no disc herniation or spinal stenosis, but there was evidence of mild facet disease. (Tr. 721.) Additionally, an MRI of Marshall's hip revealed no abnormalities. (Tr. 487.) Marshall was encouraged to see a physiatrist for pain management, but she asserted that "she [did] not want to see any other physicians." (Tr. 487.)

Physical therapy notes indicate that Marshall was discharged from physical therapy on December 4, 2006, for failing to reschedule an appointment; she had been last seen on October 9, 2006. (Tr. 568.) Two days later, Marshall resumed physical therapy. (Tr. 565–66.) However, she was once again discharged from physical therapy on March 26, 2007, for failing to reschedule an appointment. (Tr. 564.)

On March 27, 2007, MRIs of the lumbar spine and pelvis were conducted. (Tr. 560–62.) The MRI of the lumbar spine revealed very mild degenerative spondylosis without evidence of significant disc bulge, herniation, stenosis, or neural foraminal narrowing. (Tr. 560.) The MRI of the pelvis revealed mild degenerative changes at the interior aspects of the sacroiliac joint. (Tr. 562.) On June 6, 2007, Marshall presented to Advanced Pain Management complaining of groin and back pain. (Tr. 1238.) Dr. Carolyn Kochert's impression included bilateral SI joint dysfunction and left knee internal derangement. (Tr. 1239.) The plan was to proceed with SI joint injections as well as knee injections, and Dr. Kochert directed Marshall to refrain from taking NSAIDS. (Tr. 1239.) Marshall underwent SI joint injections and a knee injection on June 19, 2007, and July 18, 2007. (Tr. 559, 1234.) One week later, Marshall underwent an L5-S1 epidural steroid injection. (Tr. 557–58.)

On September 5, 2007, Marshall presented to Advanced Pain Management complaining of pain in her neck, back, buttocks, and leg, and Dr. Kochert's impression included low back pain, lumbar radiculopathy, and an MRI with minimal abnormalities. (Tr. 1228–29.) Dr. Kochert directed Marshall to continue exercise, use of medication, chiropractic care, and weight loss and encouraged her to cease smoking and using alcohol. (Tr. 1229.) During a follow-up appointment on December 3, 2007, Marshall reported that medication helped her pain for about two hours, but that she felt she was getting used to Lortab and morphine. (Tr. 1218.)

On February 20, 2008, Marshall presented to the emergency room at Home Hospital complaining of a headache and back pain. (Tr. 674.) Dr. Robert Andras assessed migraine headache and chronic low back pain. (Tr. 675.) About two weeks later, Dr. Kochert evaluated Marshall for a complaint of pain that started in her shoulder and traveled down her spine and into her groin. (Tr. 1209.) Additionally, Marshall requested an increase in her medications because she felt that her medications, as prescribed, were not giving her enough relief. (Tr. 1209.) Dr. Kochert's impression included lumbar intervertebral disk disorder, low back pain, muscle spasticity, and questionable neurologic pathology. (Tr. 1210.) MRIs of the thoracic and lumbar spines, which were taken on March 13, 2008, yielded normal results. (Tr. 496.)

On April 30, 2008, Dr. Patrick Reibold wrote a letter to Dr. Kochert concerning Marshall's chronic pain. (Tr. 1261–62.) He asserted that Marshall's "gait was initially antalgic but improved as she walked around a little bit." (Tr. 1261.) Dr. Reibold's impression included chronic low back pain without evidence of significant disc disease, and he noted that Marshall might be suffering from fibromyalgia or chronic lumbar spasm. (Tr. 1262.) Dr. Reibold noted that he offered Marshall a physical therapy referral, but she stated that she had already tried physical therapy and that it did not help. (Tr. 1262.)

On September 22, 2008, Dr. Kochert assessed lumbar facet syndrome and sacral ankylosis. (Tr. 1197.) After noting that Marshall was reluctant to decrease pain medications, Dr. Kochert explained that Marshall needed to lose weight and quit smoking. (Tr. 1197.) On June 22, 2009, Marshall presented to St. Elizabeth Regional Health Home Hospital complaining of tailbone pain; however, an examination of the sacrum and coccyx yielded normal results. (Tr. 595.)

Marshall underwent a CT scan of her left knee on July 6, 2010, and the scan did not reveal any significant radiographic abnormality. (Tr. 971.) About four months later, Marshall was evaluated at the Lafayette Orthopaedic Clinic, and Dr. Robert Hagen noted that Marshall was significantly obese. (Tr. 1045.) Additionally, Marshall exhibited excellent range of motion of both hips, and her left hip replacement was "in excellent position" with no evidence of loosening. (Tr. 1045.) When Marshall presented to the clinic, she was concerned that she had AVN of the right hip; however, x-rays did not evidence AVN. (Tr. 1045.) An x-ray of her back was also "fairly normal." (Tr. 1045.) Dr. Hagen recommended that Marshall participate in a rehabilitation program to strengthen her back. (Tr. 1045.)

On July 14, 2010, Marshall had three toenails removed due to pain and abnormalities. (Tr. 1088.) Her recovery from their excision appears to have been satisfactory, although the records note some continuing pain. (Tr. 1089–90.)

Physical therapy was again recommended—along with pain management—when Marshall was evaluated on November 12, 2010. (Tr. 1048.) X-rays of the hip were normal, and Dr. Daluga assessed degenerative changes in Marshall's lower back. (Tr. 1048.) Scans taken during February 2011 yielded relatively normal results. Specifically, a CR of the sacrum and coccyx was unremarkable, revealing that the left hip prosthesis was intact and that there was no

fracture.  (Tr. 1105.)  Next, an MRI of the lumbar spine revealed minimal degenerative disc disease at L4–5 without compromise of the canal or foramina.  (Tr. 1191.)  Last, a CT of the head did not show any acute intracranial process, and a US VEN Duplex did not evidence DVT or any other abnormality.  (Tr. 1108–09.)

Approximately one year later, thrombus was identified during a left lower extremity ultrasound.  (Tr. 1265.)  Marshall's DVT caused pain and swelling in her left lower extremity; however, such symptoms improved after Marshall underwent a thrombectomy and was treated with Lovenox.  (Tr. 1265.)  She was discharged from the hospital and directed to continue taking Lovenox.  (Tr. 1265.)  However, on February 22, 2012, Marshall presented to Arnett Hospital complaining of increased pain in her left lower extremity.  (Tr. 1282.)  Marshall informed a physician that she failed to take her Lovenox dose that morning, and after measuring Marshall's anti-xa levels, the physician asserted that it was "questionable whether she is taking Lovenox twice a day consistently."  (Tr. 1284.)  Marshall explained that she had only ever missed one dose, but the physician suspected non-compliance to an extent greater than Marshall claimed.  (Tr. 1284.)  "Due to compliance issues," Dr. Wael Harb prescribed a different medication that only required one dose per day, and he also encouraged Marshall to reduce her tobacco use.  (Tr. 1284.)  In doing so, Dr. Harb stressed that smoking increases the risk of DVT.  (Tr. 1284.)  At a follow-up appointment on March 5, 2012, Marshall reported that she had been doing well with decreased pain and only occasional swelling of the left lower extremity.  (Tr. 1288.)

On May 1, 2012, Marshall presented to Arnett Hospital complaining of pain and swelling in her left lower extremity; she was hit in the leg while "playing softball with her daughter."  (Tr. 1253.)  X-rays did not indicate fracture or acute disease process, and Dr. Anthony Steele

diagnosed Marshall with a contusion of the lower extremity.  (Tr. 1255–56, 1259–60.)

Thereafter, Marshall was discharged in stable condition.  (Tr. 1256.)

Other evidence of Marshall's physical impairments can be found in a Physical Residual Functional Capacity Assessment performed by Dr. J. V. Corcoran, which was conducted on January 10, 2011.  (Tr. 1075–82.)  Dr. Corcoran found Marshall's allegations to be credible.  (Tr. 1080.)  The doctor opined that Marshall could lift and/or carry twenty pounds occasionally and ten pounds frequently, as well as push or pull an unlimited amount, other than as shown for lift and/or carry.  (Tr. 1076.)  Dr. Corcoran also concluded and that Marshall could stand, walk, or sit about six hours of an eight-hour workday and occasionally climb, balance, stoop, kneel, crouch, and crawl.  (Tr. 1076–77.)  On March 29, 2011, Dr. D. Neal affirmed Dr. Corcoran's assessment.  (Tr. 1194.)

**B.      Medical Evidence of Mental Impairments**

Marshall's mental issues predate her claimed date of disability.  As a teenager, she was treated at a psychiatric hospital, after which she was in foster care for several months.  (Tr. 299.)  At approximately fifteen or sixteen years old, she went to Wabash Valley Psychiatric Hospital as a troubled youth with runaway behaviors, then going to the Community North Hospital in Indianapolis.  (Tr. 299.)

On January 25, 1999, Marshall presented to Arnett Clinic complaining of depression that stemmed from problems such as being fired from her job, suffering from hip pain, having conflicts with her parents, and experiencing financial difficulties.  (Tr. 335.)  She reported feelings of guilt and worthlessness, but did not feel suicidal.  (Tr. 335.)  Kellie Lohrman-Kozma (a nurse practitioner) assessed depression, prescribed a higher dosage of Zoloft, and encouraged Marshall to seek counseling.  (Tr. 335.)  Marshall failed to appear at her next appointment, but

was able to follow-up with Lohrman-Kozma on March 16, 1999. (Tr. 331.) That day, Marshall reported that she refused to see a counselor because she did not want to be told what to do, could not afford a therapist, and did not want to talk to other people about her problems. (Tr. 331.) Lohrman-Kozma assessed depression, anxiety, chronic pain, and medical non-compliance. (Tr. 330.) She again directed Marshall to see a counselor at the Alpine Clinic and stressed the importance of medical compliance. (Tr. 330.)

On March 27, 1999, Marshall presented to St. Elizabeth Medical Center complaining of an anxiety attack. (Tr. 238.) She was prescribed Xanax and discharged in good condition. (Tr. 239.) Records do not indicate any appointments regarding depression and anxiety until April 27, 2001, when Marshall presented to Arnett Clinic as "an emotional wreck." (Tr. 399.) Notes indicate that Marshall reported seeing a counselor but that the counselor was not helping; therefore, Dr. Timothy Fisher recommended that Marshall see a different counselor. (Tr. 396.)

On March 26, 2003, Marshall presented to Arnett Clinic complaining of increased weight and wanting to try another antidepressant or adding another. (Tr. 440.) During that appointment, Marshall indicated she could not go to Alpine Clinic "because they only pay 30% of the charge, and she cannot afford it." (Tr. 440.)

On August 12, 2003, Marshall presented to Arnett Clinic complaining of chest pain when she is stressed. (Tr. 429.) An EKG yielded normal results, and Dr. Cooper noted that Marshall's symptoms were likely attributable to anxiety. (Tr. 429.) Dr. Cooper strongly recommended that Marshall see a psychiatrist and explained that she did not feel comfortable prescribing Ativan or Xanax because Marshall had a long history of alcohol and drug abuse. (Tr. 429.) Dr. Cooper again "strongly encouraged her to go see a psychiatrist" when she presented on August 15, 2003,

complaining of anxiety and neck pain; Dr. Cooper suggested that the anxiety may be causing the neck pain.  (Tr. 426.)

On September 30, 2003, Marshall saw therapist John Catron at Wabash Valley Hospital ("Wabash"), and notes indicate that she did "not appear open to treatment at th[at] time and became very angry when recommendations of staff involved agreed that therapy with medications was the best option for her."  (Tr. 531.)  Notes also stated that Marshall "refused to commit to therapy and stated she only wanted to be seen for medication."  (Tr. 531.)  When Marshall was given a recommendation and referral for individual or group therapy, she stormed out of the office.  (Tr. 531.)  A letter was sent to Dr. Cooper confirming that interaction.  (Tr. 414.)  The letter stated, in part, "Marshall refused any involvement in therapy and insisted that she only wanted to be seen by the psychiatrist."  (Tr. 414.)  The notes from Wabash also indicate a diagnosis of a panic disorder without agoraphobia and dysthymic disorder, with a global assessment of functioning ("GAF") score of 50.[7]  (Tr. 529.)  On that same day, she presented to St. Elizabeth Medical Center's emergency room complaining of palpitations, anxiousness, and tearfulness.  (Tr. 283.)  Marshall asserted that she was not able to see a psychiatrist earlier that day at Wabash.  (Tr. 283.)  Therefore, she was referred to Dr. Aldo Buonanno at Alpine Clinic. (Tr. 284.)

Marshall presented to Alpine Clinic on October 1, 2003, seeking treatment for her depression and panic attacks.  (Tr. 292.)  Dr. Buonanno noted a GAF score of 43 and diagnosed Marshall with panic disorder, adjustment disorder with mixed anxiety and depression, and

_____

[7] A GAF score measures a clinician's judgment of the individual's overall level of psychological, social, and occupational functioning. *See* Diagnostic & Statistical Manual of Mental Disorders-Text Revision 32 (4th ed. 2000). The higher the GAF score, the better the individual's level of functioning. While GAF scores have recently been replaced by the World Health Organization Disability Assessment Schedule, at the time relevant to Marshall's appeal, GAF scores were in use. *See* Wikipedia, Global Assessment of Functioning, http://en.wikipedia.org/wiki/ Global_Assessment_of_Functioning (last visited Mar. 22, 2014).

depressive disorder. (Tr. 294.) Dr. Buonanno also noted that he mentioned therapy but that Marshall preferred to wait; he stated that he would address the possibility of therapy at a follow-up appointment. (Tr. 294.)

During 2005, Marshall experienced issues with panic disorder, bipolar disorder, claustrophobia, and mood swings and was treated with various medications, such as Lamictal, that helped. (Tr. 524.) Clinic notes from 2006 indicate that Marshall continued having issues with panic disorder, mood swings, insomnia, and panic attacks and that the Lamictal was increasing her irritability. (Tr. 523–24.) On February 16, 2006, Dr. Buonanno noted that he encouraged Marshall to see a therapist. (Tr. 323.) However, the record does not contain evidence that Marshall pursued therapy at that time.

On March 9, 2007, Dr. Buonanno noted a diagnosis of Panic Disorder with some agoraphobia and Mood Disorder in Axis I; panic attacks, mood instability, anxiety, and unemployment in Axis IV; and a GAF score of 46. (Tr. 301.)

On April 26, 2007, Marshall reported that she would never kill herself and loves her kids. (Tr. 321.) However, on August 16, 2008, she was hospitalized for auditory hallucinations that told her to kill herself and her children. (Tr. 625.) While at the hospital, Marshall participated in group therapy, and her condition improved overall. (Tr. 626.) On August 19, 2008, she was discharged in stable condition and directed to make an appointment with a therapist. (Tr. 625–26.) The record does not contain evidence indicating that Marshall pursued therapy after this directive.

Subsequently, on November 10, 2008, Marshall was again admitted to the emergency room with auditory hallucinations instructing her to kill herself and her children. (Tr. 599.) Upon arrival, she was diagnosed with major depressive disorder with psychotic features, and her

GAF was 20.  (Tr. 601.)  After discovering that Marshall's lithium level was only .2, Dr. Christopher Cobbs claimed that Marshall "clearly ha[d] not been taking some of her medications."  (Tr. 601.)  Dr. Cobbs directed her to take her medications and attend group therapy in the days she was hospitalized.  (Tr. 601.)  Dr. Cobbs noted that Marshall's auditory hallucinations "dramatically improved" over the course of her hospitalization, her sleep improved, her "affect improved markedly well, and she became much brighter, more hopeful about going home."  (Tr. 597.)  On November 14, 2008, Marshall was discharged in stable condition, and her GAF was 50.  (Tr. 596–97.)  Thereafter, Marshall saw Dr. Buonanno, a psychiatrist at the Alpine Clinic, on a regular basis.  (Tr. 955–57.)

On October 4, 2010, Dr. Gerald Gruen completed a consultative evaluation for the Disability Determination Bureau.  (Tr. 976–79.)  He noted a mood disorder as well as a GAF of 50 and opined that Marshall was capable of managing her own funds, but could benefit from some help.  (Tr. 979.)  Additionally, he explained that Marshall's "pain prevent[ed] her from functioning at the highest levels of which she was capable."  (Tr. 979.)

On October 13, 2010, Dr. Stacia Hill completed a Psychiatric Review Technique and noted that Marshall had a mood disorder.  (Tr. 1014–17.)  Dr. Hill opined that Marshall had mild difficulties in maintaining social functioning; mild restriction of activities of daily living; and moderate difficulties in maintaining concentration, persistence, and pace.  (Tr. 1024.)  Next, Dr. Hill completed a Mental Residual Functional Capacity Assessment.  (Tr. 1028–30.)  She opined that Marshall is moderately limited in the ability to understand, remember, and carry out detailed instructions; work in coordination or proximity to others without distraction; complete a normal workday and workweek without interruptions from psychologically based symptoms; interact appropriately with the general public; and respond appropriately to changes in her work setting.

(Tr. 1028–29.)  Ultimately, Dr. Hill concluded that Marshall is capable of understanding, remembering, and carrying out simple tasks; relating on a superficial basis with co-workers and supervisors; attending to tasks for the amount of time required; and managing the stresses involved with work.  (Tr. 1030.)  On March 23, 2011, Dr. Kladder affirmed Dr. Hill's assessment.  (Tr. 1193.)

## C.    Hearing Testimony

At the May 31, 2012, hearing before ALJ Studzinski, testimony was heard from Marshall and Vocational Expert ("VE") Leonard Fisher.  (Tr. 778–79.)

### 1.    *Marshall's Testimony*

Marshall testified that she lives with her husband and five children who were between the ages of ten and nineteen.  (Tr. 789.)  Regarding education and work history, Marshall obtained a GED and has held multiple jobs.  (Tr. 789.)  In 1997, Marshall worked for Time Industrial, and she worked as a wire harness assembler for Kirby Risk Corporation ("Kirby") the following year.  (Tr. 790.)  As a wire harness assembler, the heaviest item Marshall lifted was two pounds, and she was able to sit or stand as much as needed.  (Tr. 805–06.)  While working at Kirby, Marshall developed AVN, confining her to a wheel chair for ambulation.  (Tr. 806.)  She believes she was fired for remaining in the wheel chair too long.  (Tr. 806.)  Subsequently, during 2002, she worked at Subway for three months.  (Tr. 789.)  However, Marshall maintains that she had to quit the Subway job because it required her to bend over, which caused her back to spasm and lock up.  (Tr. 789, 791.)

Marshall explained that she is currently unable to work because of back problems that arise when she stands for long periods of time.  (Tr. 791.)  According to Marshall, after either her 1997 hip decompression or 1998 hip replacement surgery, her hip surgeon advised her to refrain

from sitting or standing for more than one hour at a time.  (Tr. 791.)  She believes that, as of 2004, her hip replacement has caused one leg to be shorter than the other, making her walk with a wobble and aggravating her back.  (Tr. 798.)  Marshall explained that she has to use crutches to help with her balance due to the difference in the length of her legs.  (Tr. 808.)

Marshall also asserted that Dr. Harb, the physician treating her for blood clots, directed her to spend more time sitting than standing due to irritation from the TED hose she was required to wear.[8]  (Tr. 792.)  In addition to wearing the TED hose, Marshall also treated her blood clots by using blood thinners, rubbing her legs four times each day, and icing her legs.  (Tr. 801.)  Her doctor told her that new veins will form, but that the clot will not disappear entirely.  (Tr. 802.)  Marshall complained of leg pain stemming from a knee surgery she underwent when she was fourteen or fifteen-years-old.  (Tr. 798.)  Marshall also explained that, if she stands for an hour, she needs to sit for about forty-five minutes and that, if she sits for an hour, she typically needs to take a couple steps and stretch before sitting down again.  (Tr. 792–93.)  Marshall testified that her brother-in-law gives her two deep tissue massages each month to help ease her back and leg pains.  (Tr. 795.)

Marshall also discussed her mental condition.  (Tr. 794–95.)  She believes that she has depression, anxiety, bipolar disorder, and claustrophobia.  (Tr. 794, 799.)  The anxiety and claustrophobia make it difficult for Marshall to be in large groups.  (Tr. 799.)  She also complained of issues with insomnia, explaining that, while she could probably sleep for twenty hours straight, her insomnia sometimes interferes with her sleep.  (Tr. 801.)  Marshall's doctors recommended medication and counseling to treat her mental condition; however, Marshall

---

[8] TED hose is a common description for compression stockings designed to protect against venous disorders, including DVT.

refused counseling because she believed that talking about her problems would worsen, rather than help, her condition.  (Tr. 794.)

With regard to her daily activities, Marshall explained that she is able to drive for about a half hour as well as attend her daughter's softball games and play catch with her.  (Tr. 789, 796.) However, she is not able to throw the ball because it hurts her back; she is only able to catch the ball and roll it back to her daughter.  (Tr. 796.)  She also stated that her children complete approximately ninety percent of the housework and cooking.  (Tr. 793.)  For example, they assisted Marshall with the laundry by placing the basket on top of the dryer and removing the clothes from the dryer; Marshall would then sit on the couch and fold the clothes.  (Tr. 800.) Marshall received help with taking care of her youngest children from her older children and her father.  (Tr. 800.)  Marshall maintained that she and her husband do not go out because they cannot afford to do so.  (Tr. 797.)  Additionally, she asserted that she does not have any friends to discuss her problems with.  (Tr. 797.)

   2. *Vocational Expert's Testimony*

The VE characterized Marshall's past work as a wire harness assembler as light level work.  (Tr. 807.)  The ALJ asked the VE whether jobs exist in the national economy for an individual of Marshall's age, education, and vocational background who:  can sit and stand for a maximum of one hour before assuming a different position for five minutes prior to returning to the previous position; can stand and walk no more than four of eight hours in the workday; can sit throughout an eight-hour workday if provided five minutes per hour to assume a different position; cannot climb ladders, ropes, or scaffolds; can occasionally climb ramps or stairs, balance, stoop, kneel, crouch, and crawl; cannot drive or operate heavy machinery as a part of work; cannot work at unprotected heights, around exposed flames, or around large bodies of

water; cannot have exposure to workplace hazards or unguarded hazardous machinery; cannot come up with creative solutions to novel situations; cannot work at an above-average production rate; can only be exposed to occasional and minor changes in the work setting; is limited to simple, routine, repetitive tasks with only simple decision-making; has moderate deficiencies in concentration, persistence, or pace; and has moderate social functioning deficits and thus, cannot work in direct public service positions or in the middle of crowds, but can tolerate brief and superficial interaction with co-workers.  (Tr. 809–13.)

In response, the VE explained that, while an individual with the above-mentioned limitations could not perform Marshall's past work, other jobs exist in the national economy that such an individual could perform in spite of the limitations.  (Tr. 813.)  These jobs, which are considered unskilled, specific vocational preparation ("SVP") of two,[9] and light, include but are not limited to: inspector (approximately 20,950 in the state and more than 300,000 in the national economy); and encapsulator (5,900 in the state and 216,470 in the national economy).  (Tr. 813–14.)

Next, the ALJ asked the VE about the job availabilities for a second hypothetical individual who had all of the previously-mentioned limitations in addition to the following restrictions:  limitation to sedentary-level work; ability to lift a maximum of ten pounds; and inability to stand and walk more than two hours of the workday.  (Tr. 814.)  The VE asserted that such an individual could perform the following jobs despite the limitations:  addresser (790 in the state and 101,450 in the national economy); hand mounter (540 in the state; 17,420 in the national economy); taper/printed/circuit/layout (5,000 in the state; 229,240 in the national economy); and polisher/eyeglass frames (4,100 in the state and 82,740 in the national economy).

---

[9] An SVP is utilized in the DOT as an estimate of the amount of time required to prepare for a specific occupation. An SVP of either one or two in the DOT corresponds to the definition of unskilled work in 20 C.F.R. §§ 404.1568, 416.968.  SSR 00-4p.

(Tr. 814.)  Marshall's counsel also questioned the VE.  When asked by Marshall's counsel how

missing work would affect his conclusion, the VE explained that, with the exception of sick

days, holidays, vacation days, and personal leave, if an individual misses more than one workday

per month, that individual would experience difficulty sustaining competitive employment.  (Tr.

815.)  Similarly, the VE asserted, in response to a question by Marshall's counsel, that sustaining

employment would also be difficult for an individual who must leave work two hours early one

day each week.  (Tr. 815–16.)

**D.      The ALJ's Decision**

On August 20, 2012, the ALJ rendered his decision, ultimately finding that Marshall is

not disabled.  (Tr. 736–63.)  The analysis conducted by the ALJ was identical with respect to

both the 2006 and 2010 applications.  He found the following severe impairments:

> an anxiety-related disorder, a panic disorder with agoraphobia, an
> adjustment disorder, a depressive disorder, schizophrenic
> tendencies, a bipolar disorder, obesity, the late-effects of avascular
> necrosis of the left hip status-post total hip arthroplasty, the late-
> effects of left knee arthroscopy and right knee contusion,
> myofascial pain syndrome of the thoracolumbar region of the back,
> end-plate spurring of the cervical spine, plantar fasciitis, lumbar
> degenerative spondylosis and sacroiliac joint dysfunction.

(Tr. 742.)  The ALJ also noted the following non-severe impairments: "a headache disorder,

bilateral lower extremity edema, a hernia, gastro-esophageal-reflux disease, diabetes mellitus,

hypertension, high cholesterol and hypertriglyceridemia, onychocryptosis of multiple pedal nails,

left lower extremity deep venous thrombosis, and insomnia."  (Tr. 742.)

The ALJ deemed each of these to be non-severe for various reasons.  He stated that, with

respect to each of the non-severe conditions, "the objective medical evidence available to [the

ALJ] does not indicate that they would impose more than a minimal impact upon the claimant's

ability to engage in basic work activity or does not indicate that they would persist in imposing

more than minimal limitation for a period of one year or longer." (Tr. 742.) With respect to Marshall's headaches, the ALJ deemed them non-severe because head and brain imaging was consistently unremarkable and her headaches ceased with treatment. (Tr. 742.) He deemed Marshall's bilateral lower extremity edema non-severe based on treatment she received, scarce subsequent complaints, and March 2012 notations indicating that Marshall was doing well with only occasional edema. (Tr. 743.) The ALJ found Marshall's hernia, gastro-esophageal-reflux disease, onychocryptosis of pedal nails, and insomnia non-severe, reasoning that the record is devoid of evidence indicating on-going problems with these issues after treatment. (Tr. 743–44.) Despite recognizing that Marshall's diabetes has not been under control, the ALJ deemed this impairment non-severe based on Marshall's failure to comply with treatment directives, such as adhering to a diabetic diet and endocrine treatment regimen, as well as exercising; the ALJ was unable to conclude "that, in the presence of appropriate treatment, this impairment would more than minimally impact the claimant's ability to engage in basic work activity." (Tr. 743.) The ALJ further asserted that complaints of pain were not justifications for failure to comply with such treatments because Marshall was not compliant with pain management treatment directives. (Tr. 743.) Although Marshall was diagnosed with hypertension, high cholesterol, and high triglyceride levels, the ALJ reasoned that such impairments were non-severe because adherence to prescribed diet, lifestyle, and medical treatment regimens would prevent the impairments from more than minimally impacting her ability to engage in work activities. (Tr. 743–44.) The ALJ explained that Marshall's deep venous thrombosis was non-severe because evidence indicated that she responded very well to anti-coagulant therapeutical treatment despite her failure to adhere to pertinent medical directives. (Tr. 744.)

The ALJ noted other claimed impairments, but found them to be non-medically determinable. He found Marshall's pubic symphaseal tenderness non-medically determinable, reasoning that the record does not contain a definitive diagnosis of an impairment responsible for the symptom or evidence of ongoing symptoms. (Tr. 745.) Similarly, the ALJ deemed Marshall's alleged fibromyalgia and irritable bowel syndrome non-medically determinable because definitive diagnoses were lacking. (Tr. 745.)

Finally, the ALJ explained that, although Marshall had a history of below average academic performance, this did not preclude her from engaging in work activities. (Tr. 745.) He reasoned that Marshall was able to obtain a GED and that she has not argued her academic performance impacted her ability to work prior to the alleged onset date, even though her academic performance issues predated her claimed disability. (Tr. 745.)

At step three, the ALJ determined that Marshall did not have an impairment or combination of impairments that met or medically equaled a listed impairment.[10] (Tr. 745–48.)

The ALJ then articulated the following residual functional capacity ("RFC") determination:

> [Marshall] has the residual functional capacity to perform sedentary work . . . except that she is limited to work comprised of simple, routine, repetitive tasks, requiring sitting/standing for no more than one hour at a time with a five minute period per hour to assume a different position; further requiring no climbing of ladders, ropes, and scaffolds, no more than occasional climbing of ramps and stairs, balancing, stooping, kneeling, crouching, and crawling. Additionally [Marshall] is limited to work which does not require: exposure to unprotected heights and workplace hazards, concentrated exposure to unguarded hazardous machinery; more than occasional and minor changes in work setting; more than the exercise of simple judgment; more than an average production rate without rush periods; direct public service,

---

[10] Marshall has not challenged the ALJ's step three determination; therefore, the Court does not address that determination.

work in crowded environments; and more than brief and
superficial interaction with co-workers.

(Tr. 748.)  In making that determination regarding Marshall's RFC, the ALJ conducted a

credibility analysis.  (Tr. 749–53.)

The ALJ concluded that Marshall's allegations concerning mental impairments were not

fully credible, reasoning that such allegations were inconsistent with the objective medical

evidence.[11]  (Tr. 749.)  He noted that Marshall's history of mental health treatment predate both

the alleged onset date and the commencement and cessation of her engagement in substantial

gainful activity.  (Tr. 749.)  The ALJ explained that although Marshall has been repeatedly

advised to seek recurrent and psychotherapeutic counseling she has only attended counseling

sporadically and, instead, relied on medications.  (Tr. 749.)  He further asserted that Marshall

failed to consistently comply with prescription instructions, which diminished the effectiveness

of the medications.  (Tr. 749.)  To support this assertion, the ALJ noted a 2008 psychiatric

hospitalization that occurred after Marshall was non-compliant with psychiatric treatment.  (Tr.

749.)  The ALJ noted that, by the time Marshall was discharged from the hospital, she had been

undergoing counseling and taking her medications and her condition had markedly improved.

(Tr. 749.)  In finding that Marshall was less than credible, the ALJ also relied on evidence from

the Alpine Clinic indicating that Marshall's condition had generally improved.  (Tr. 749.)

Furthermore, he asserted that although Marshall experienced difficulty with complex tests of

concentration, she was able to successfully perform basic concentration tests and maintain good

concentration throughout evaluations.  (Tr. 750.)

---

[11] The ALJ specified the following alleged mental impairments:  "an anxiety-related disorder, a panic disorder with
agoraphobia, an adjustment disorder, a depressive disorder, schizophrenic tendencies, a bipolar disorder including
difficulty sustaining concentration, difficulty with social interaction, and recurrent symptoms of panic with
palpitations."  (Tr. 749.)

Next, the ALJ conducted a credibility analysis of Marshall's allegations of physical impairments, ultimately concluding that her allegations were not fully credible. (Tr. 750.) He determined that Marshall's allegations of symptoms consistent with AVN of the left hip were not credible since her hip range-of-motion has consistently been assessed as excellent, except for one instance in 2008. (Tr. 750.) Further, he noted that imaging does not indicate evidence of AVN in the right hip. (Tr. 750.) The ALJ rejected the credibility of Marshall's allegations regarding symptoms from the late effects of a left knee arthroscopy and a right knee contusion because x-rays performed between 2004 and 2010 indicated no significant radiographic abnormalities; the most recent consultative examination noted that although Marshall exhibited reduced flexion of the left knee, she had full flexion of the right knee and did not have inflammation, effusion, or swelling in either knee; and the impairments predate the alleged onset date without evidence of significant exacerbation thereafter. (Tr. 750–51.) The ALJ determined that Marshall's allegations were not fully credible as to symptoms resulting from end plate spurring of the cervical spine. (Tr. 751.) He reasoned that, despite Marshall's complaints of a stiff neck, x-rays have indicated only "very minimal" end plate spurring and testing has repeatedly indicated that she has a full range of motion in her neck, her bilateral upper extremity strength is 5/5, and her motor function is intact. (Tr. 751.) The ALJ then rejected the credibility of Marshall's allegations relating to lumbar degenerative spondylosis and sacroiliac joint dysfunction with associated myofascial pain syndrome in the back. (Tr. 751.) In doing so, he explained that lumbar imaging has either evidenced minimal degenerative changes or has yielded normal results; lumbar range of motion has been full or minimally diminished; Marshall has not undergone treatment for this impairment other than an epidural steroid injection and treatments associated with general back pain; the pain does not prevent Marshall from playing sports with

her children; Marshall failed to pursue recommended pain management and therapy for her back; and there is a lack of evidence of ongoing difficulty remaining in a seated position. (Tr. 751–52.) Finally, the ALJ determined that Marshall's allegations of plantar fasciitis and symptoms related thereto were not credible because her impairment has been noted as controlled with the use of orthotics and prescribed athletic shoes. (Tr. 752.)

Finally, the ALJ assessed the credibility of the treating and consulting physicians. (Tr. 752–53.) He afforded little weight to the State agency medical consultants' physical assessment, reasoning that Marshall is more limited than initially assessed. (Tr. 752.) The ALJ gave great weight to the State agency psychological consultants' mental assessment to the extent that it limited Marshall to unskilled work with limited social interaction, but gave little weight to the remainder of the opinion because the ALJ believed Marshall more limited than originally assessed. (Tr. 752.) He also gave great weight to Dr. Cooper's assertion that Marshall does not qualify for disability, given its consistency with the medical evidence. (Tr. 752.) Thereafter, the ALJ gave partial weight to Dr. Bangura's opinion that Marshall was limited to standing/walking a maximum of two hours in an eight-hour workday and lifting over ten pounds. (Tr. 752.) He reasoned that the standing and ambulatory restrictions were consistent with the record, but that the record reflected a greater limitation in Marshall's lifting ability than that accounted for by Dr. Bangura. (Tr. 752.) Last, the ALJ gave significant weight to Dr. Gruen's opinion that Marshall's "symptoms of pain limit her ability to function at the highest level of which she is capable . . . ." (Tr. 752–53.) He explained that Dr. Gruen's opinion was consistent with other evidence indicating that Marshall's non-compliance with pain management directives has inhibited progression of her treatment. (Tr. 753.)

At step four, the ALJ determined that Marshall was unable to perform her past work as a wire harness assembler because the job exceeded the limitations set forth in the RFC.  (Tr. 753.)

At step five, based on the VE's testimony, the ALJ concluded that Marshall was not disabled because jobs existed in the national economy that Marshall could perform despite the limitations in the RFC.  (Tr. 753–54.)

Based on these findings, the ALJ found, with respect to the 2006 application for disability insurance benefits, that Marshall was not disabled under 42 U.S.C. §§ 416(i), 423(d).  The ALJ also found, with respect to the 2010 application for supplemental security income, that Marshall was not disabled under 42 U.S.C. § 1382c(a)(3)(A).

### III.  Jurisdiction

As an initial matter, the Court must determine whether it has jurisdiction to hear Marshall's case.  The sole basis for this Court's jurisdiction in Social Security cases is 42 U.S.C. § 405(g).  However, section 405(g) limits this Court's review to "any final decision of the Commissioner of Social Security."  *Id.*  Determining whether the ALJ's decision in this case is a final decision of the Commissioner is complicated by the fact that the ALJ's decision concerned two separate sets of applications by Marshall, each with differing procedural histories.

As more fully described above, the 2006 application for disability insurance benefits was originally heard by a different ALJ in 2009.  (Tr. 27–52.)  The Appeals Council denied review of that unfavorable decision (Tr. 1–5) and Marshall filed a complaint in this Court.  The Court granted a sentence four remand (Tr. 874–79), after which the application was re-heard by a different ALJ, who issued the decision at issue in this opinion.

Following a remand by a district court, the decision of the ALJ constitutes the final decision of the Commissioner, unless the Appeals Council assumes jurisdiction of the case,

either based on exceptions filed by the claimant or on its own discretion within 60 days of the ALJ's decision.  20 C.F.R. § 404.984(a), (d).  Here, Marshall did not file any exceptions and the Appeals Council did not assume jurisdiction on its own.  Therefore, the ALJ's decision became the final decision of the Commissioner on the expiration of the period for the Appeals Council to assume jurisdiction.  20 C.F.R. § 404.984(d).

While that resolves the jurisdiction to hear the portion of the decision that addresses Marshall's claims for disability insurance benefits stemming from the 2006 application, the ALJ's decision also addresses Marshall's 2010 application for supplemental security income. That application has not previously been heard by an ALJ and was not the subject of a prior remand.  Accordingly, whether or not the ALJ's decision is a final decision of the Commissioner as to the 2010 application requires further discussion.

As a starting point, the Court notes that separate procedures exist for administrative exhaustion of an unfavorable decision on a new claim, 20 C.F.R. §§ 404.967, 416.1467, and for administrative exhaustion of an unfavorable decision on a claim previously remanded from federal court, 20 C.F.R. §§ 404.984, 416.1484.  As noted above, an unfavorable decision on a claim previously remanded becomes a final decision of the Commissioner if the Appeals Council declines to accept jurisdiction.  However, an unfavorable decision on a claim that was not subject to a prior remand becomes final only upon requesting that the Appeals Council review the decision.  20 C.F.R. §§ 404.900(a)(5), 416.1400(a)(5).

The regulations further allow for multiple claims to be heard during a single consolidated hearing before an ALJ.  20 C.F.R. §§ 404.952, 416.1452.  The regulations are silent, however, as to whether the appeals from those claims are also consolidated.  *See Carroll v. Astrue*, 402 F. App'x 709, 712 n.4 (3d Cir. 2010).  The regulations are further silent as to whether, if the

appeals are consolidated, which finality rules apply. In light of this silence, district courts have generally held that when the Appeals Council declines to assume jurisdiction of a case in which new claims have been consolidated with remanded ones, the Appeals Council's failure to assume jurisdiction as to the remanded claims makes the ALJ's ruling the final decision of the Commissioner with respect to all claims in the decision. *See Rasdall v. Astrue*, No. 06-2454, 2008 WL 695770, at *7 (D. Kan. Mar. 13, 2008) ("Because the Appeals Council declines to assume jurisdiction over the consolidated decisions, those decisions became the final decision of the Commissioner on remand."); *Adams v. Astrue*, No. 2:06CV75, 2007 WL 4358344, at * 2 (W.D. Va. Dec. 12, 2007) (finding ALJ decision on consolidated claims to be final decision of the Commissioner).

This Court agrees and concludes that the failure of the Appeals Council to accept jurisdiction over a decision that contains both new claims and claims which have been remanded from federal court renders the ALJ's decision a final decision of the Commissioner with respect to all claims contained within the decision. To hold otherwise would require one decision to be subjected to two different appeals mechanisms. Additionally, the Court notes that the letter to Marshall accompanying the ALJ's decision makes reference to only one appeal mechanism, that for a remanded case. (Tr. 736–37.) The Commissioner has not argued that the Court lacks jurisdiction to consider Marshall's challenge to the denial of her 2010 application, nor has the Commissioner objected to both petitions being considered in the same case in this Court. Finally, the procedure of allowing the Appeals Council to assume jurisdiction over a remanded case presumes the Appeals Council will review the decision and record in determining whether to accept jurisdiction. Such a process therefore satisfies the purpose of administrative exhaustion and the Court finds no prejudice to Marshall in this situation.

Accordingly, the Court determines that the ALJ's decision was a final decision of the Commissioner—with respect to all claims considered in the decision—and the Court has jurisdiction to consider Marshall's claims.

## IV. Standard of Review

In accordance with the analysis above, the ruling made by the ALJ became final when the Appeals Council declined to accept jurisdiction over the case. Thereafter, in its review, this Court will affirm the Commissioner's findings of fact and denial of disability benefits if they are supported by substantial evidence. *Craft v. Astrue*, 539 F.3d 668, 673 (7th Cir. 2008). Substantial evidence consists of "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales,* 402 U.S. 389, 401 (1971). This evidence must be "more than a scintilla but may be less than a preponderance." *Skinner v. Astrue*, 478 F.3d 836, 841 (7th Cir. 2007). Thus, even if "reasonable minds could differ" about the disability status of the claimant, the Court must affirm the Commissioner's decision as long as it is adequately supported. *Elder v. Astrue*, 529 F.3d 408, 413 (7th Cir. 2008).

In this substantial-evidence determination, the Court considers the entire administrative record but does not reweigh evidence, resolve conflicts, decide questions of credibility, or substitute the Court's own judgment for that of the Commissioner. *Lopez ex rel. Lopez v. Barnhart,* 336 F.3d 535, 539 (7th Cir. 2003). Nevertheless, the Court conducts a "critical review of the evidence" before affirming the Commissioner's decision, and the decision cannot stand if it lacks evidentiary support or an inadequate discussion of the issues. *Id.* Ultimately, while the ALJ is not required to address every piece of evidence or testimony presented, the ALJ must provide a "logical bridge" between the evidence and the conclusions. *Terry v. Astrue*, 580 F.3d 471, 475 (7th Cir. 2009).

Further, conclusions of law are not entitled to deference; so, if the Commissioner commits an error of law, reversal is required without regard to the volume of evidence in support of the factual findings. *Binion v. Chater*, 108 F.3d 780, 782 (7th Cir. 1997).

## V. Analysis

Disability and supplemental insurance benefits are available only to those individuals who can establish disability under the terms of the Social Security Act. *Estok v. Apfel*, 152 F.3d 636, 638 (7th Cir. 1998). Specifically, the claimant must be unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). The Social Security regulations create a five-step sequential evaluation process to be used in determining whether the claimant has established a disability. 20 C.F.R. § 404.1520(a)(4). The steps are to be used in the following order:

1. Whether the claimant is currently engaged in substantial gainful activity;

2. Whether the claimant has a medically severe impairment;

3. Whether the claimant's impairment meets or equals one listed in the regulations;

4. Whether the claimant can still perform relevant past work; and

5. Whether the claimant can perform other work in the community.

*Dixon v. Massanari*, 270 F.3d 1171, 1176 (7th Cir. 2001). At step three, if the ALJ determines that the claimant's impairment or combination of impairments meets or equals an impairment listed in the regulations, disability is acknowledged by the Commissioner. 20 C.F.R. § 404.1520(a)(4)(iii). However, if a listing is not met or equaled, in between steps three and four, the ALJ must then assess the claimant's RFC, which, in turn, is used to determine whether

the claimant can perform his past work under step four and whether the claimant can perform other work in society at step five of the analysis. 20 C.F.R. § 404.1520(e). The claimant has the initial burden of proof in steps one through four, while the burden shifts to the Commissioner in step five to show that there are a significant number of jobs in the national economy that the claimant is capable of performing. *Young v. Barnhart*, 362 F.3d 995, 1000 (7th Cir. 2004).

Marshall challenges the ALJ's decision on two grounds. First, she argues that the ALJ's credibility determination of Marshall's testimony is patently wrong. [DE 22 at 16–21.] Second, she argues that the evidence of other work existing in significant number in the national economy was insufficient, because the jobs offered by the VE were of a reasoning level inconsistent with the RFC articulated by the ALJ. [DE 22 at 21–23.] The Commissioner urges the Court to affirm the ALJ's decision and argues that the ALJ reasonably found that Marshall's claims of debilitating pain were not entirely credible [DE 34 at 5–12] and that the ALJ reasonably relied on the VE's testimony at step five [DE 34 at 12–15]. The Court addresses each argument in turn.

## A.     Credibility Determination

Marshall contends that the ALJ's credibility assessment is patently wrong for multiple reasons. She argues that the ALJ misstated the record regarding non-compliance with recommendations of counseling, recommendations of pain management, and adherence to prescribed medications. She argues that the ALJ attributes to her activity levels that are not consistent with the record. She additionally argues that the ALJ did not consider all of the necessary factors under SSR 96-7p and failed to include any personal observation or question her regarding her access to care, financial status, or compliance. Marshall argues that, without these cumulative errors, the RFC would not have allowed Marshall to perform other work.

Because an ALJ is in the best position to observe witnesses, an ALJ's credibility determination will not be upset on appeal so long as it finds some support in the record and is not patently wrong. *See Craft*, 539 F.3d at 678. Indeed, "[o]nly if the trier of facts grounds his credibility finding in an observation or argument that is unreasonable or unsupported . . . can the finding be reversed." *Prochaska v. Barnhart*, 454 F.3d 731, 738 (7th Cir. 2006). However, as a bottom line, SSR 96-7p requires an ALJ to consider the entire case record and articulate specific reasons to support his credibility finding. *Golembiewski v. Barnhart*, 322 F.3d 912, 915 (7th Cir. 2003). Further, while an ALJ is not required to provide a complete written evaluation of every piece of testimony and evidence, an ALJ cannot simply state that an individual's allegations have been considered or that the individual's allegations are not credible. *Rice v. Barnhart*, 384 F.3d 363, 370 (7th Cir. 2004); SSR 96-7p.

The process for evaluating a claimant's symptoms is organized around two major steps. First, the claimant must provide objective medical evidence of a medically determinable impairment or combination of impairments that reasonably could be expected to produce the alleged symptoms. 20 C.F.R. § 404.1529(a)–(b). Second, after the claimant satisfies the first step, the ALJ must then evaluate the intensity, persistence, and limiting effects of the individual's symptoms to determine the extent to which the symptoms limit the individual's ability to do basic work activities. 20 C.F.R. § 404.1529(c). While an ALJ may not reject subjective complaints of pain solely because they are not fully supported by medical testimony, the ALJ may consider that as probative of the claimant's credibility. *Powers v. Apfel*, 207 F.3d 431, 435 (7th Cir. 2000); SSR 96-7p.

In this case, the ALJ did find that Marshall's medically determinable impairments could reasonably be expected to cause the alleged symptoms, but found her allegations of intensity,

persistence, and limiting effects to be not credible to the extent they were inconsistent with the RFC.  (Tr. 749.)

Turning to Marshall's specific arguments, the Court disagrees that the ALJ either misstated or exaggerated the record in reaching his credibility determination regarding compliance with medical directives.  While Marshall argues that the determinations are "a pure misstatement of the record" [DE 22 at 17], the Commissioner correctly notes that the record contains numerous instances in which Marshall did not consistently comply with treatment directives or suggestions.  For instance, there were several occasions on which Marshall was encouraged to participate in counseling to address her mental impairments, including by Dr. Buonanno, but did not do so.  (Tr. 294, 297, 323, 330–32, 396, 414, 426, 429, 528, 531–32, 625–26.)  Additionally, there were several occasions on which Marshall was encouraged to engage in pain management or physical therapy, but did not do so or was inconsistent in keeping up with treatments.  (Tr. 336, 390, 415, 420, 487, 564, 568, 1045, 1048.)  That is not to say that she never had any counseling, physical therapy, or pain management.  (Tr. 955–59, 1234.)  However, on the whole, the ALJ's factual conclusions that Marshall engaged in only sporadic counseling and failed to seek pain management and physical therapy for her back pain are supported by the record.

Second, the activity levels noted by the ALJ are consistent with the record, with one exception noted here.  With respect to Marshall's back pain, the ALJ noted "the pain does not prevent claimant from playing softball, basketball, and football with her children."  (Tr. 751.)  Here, the Court could not locate any references in the record to Marshall playing basketball or football.  Additionally, Marshall testified that when she played softball, that activity consisted of sitting on a bucket, catching a ball, and rolling it back to her daughter.  (Tr. 796.)  However, the

medical evidence in the record does not indicate any express limitation of her ability to perform any sports activities. Rather, the medical records make reference to Marshall "playing softball" or "playing softball with her daughter." (Tr. 361, 669, 1253.) Under these circumstances, the Court does not consider any overstatement by the ALJ in this regard as significant.

Third, the ALJ did consider the factors under SSR 96-7p, at least in part, in determining the credibility of Marshall's claims of pain. The regulations identify seven examples of the kind of evidence that the ALJ considers, in addition to objective medical evidence, when assessing the credibility of an individual's statements:

> (1) the individual's daily activities; (2) the location, duration, frequency, and intensity of the individual's pain or other symptoms; (3) factors that precipitate and aggravate the symptoms; (4) the type, dosage, effectiveness, and side effects of any medication the individual takes or has taken to alleviate pain or symptoms; (5) treatment, other than medication, the individual receives or has received for relief of pain or other symptoms; (6) any measures other than treatment the individual uses or has used to relieve pain or other symptoms (e.g., lying flat on his or her back, standing for 15 to 20 minutes every hour, or sleeping on a board); (7) any other factors concerning the individual's functional limitations and restrictions due to pain or other symptoms.

SSR 96-7p; 20 C.F.R. § 404.1529(c). The ALJ need not mechanically recite findings on each factor, but must give specific reasons for the weight given to the individual's statements. SSR 96-7p.

Here, the majority of the ALJ's analysis focused on the objective medical evidence. The ALJ also considered Marshall's daily activities (including household chores, playing sports with her children, attending her children's sporting events, and shopping at yard sales), treatment Marshall has received for relief of pain (including a steroid injection for back pain), and any measures other than treatment Marshall uses to relieve pain (noting that the RFC limits the time that she stands and allows for changes in position, consistent with Marshall's hearing testimony). The ALJ also considered the fact that the frequency of treatment was inconsistent with the level

of complaints.  While Marshall did not explicitly argue that the ALJ erred in considering the infrequency of treatment, the Court notes that infrequent treatment or failure to adhere to a treatment plan can support an unfavorable credibility determination if the claimant does not have good reason for the infrequency or lack of treatment.  *Craft*, 539 F.3d at 679 (citing SSR 96-7p). However, in making that determination, an ALJ is prohibited from drawing negative inferences regarding a failure to comply with directives by pursuing further treatment unless the ALJ first explores the claimant's reasons for the lack of compliance.  *Id; see also* SSR 96-7p ("However, the adjudicator may not draw any inferences about an individual's symptoms and their functional effects from a failure to seek or pursue regular medical treatment without first considering any explanations that the individual may provide, or other information in the case record, that may explain infrequent or irregular medical visits or failure to seek medical treatment.  The adjudicator may need to recontact the individual or question the individual at the administrative proceeding in order to determine whether there are good reasons the individual does not seek medical treatment or does not pursue treatment in a consistent manner.").

In this case, Marshall testified at the hearing that her doctors have recommended counseling, but that she did not pursue it because she believed that talking about her problems would just make them worse.[12]  (Tr. 794.)  The ALJ was free to determine that this was an insufficient reason for failing to pursue treatment, especially in light of the evidence of record indicating that when Marshall attended group therapy while in the hospital her condition

---

[12]  This is consistent with Marshall's statements at the time of treatment, where she noted that "being in groups makes her even more anxious."  (Tr. 292.)  The record does reflect at one point that Marshall had "financial stressors and insurance here for her therapists or a doctor pays only about 50% so she is concerned about cost," (Tr. 292), but Marshall did not offer such evidence at the hearing and does not argue in her brief before this Court that the ALJ erred in failing to consider that information.  The Court did not locate any other mention of financial hardship in obtaining therapy or any statement that such issue consistently prohibited treatment.

markedly improved. (Tr. 626.) Accordingly, the ALJ was entitled to draw a negative inference regarding Marshall's failure to pursue counseling despite its numerous recommendations.

The Court could not locate in the record any explanation for why Marshall did not seek physical therapy or pain management and the ALJ failed to question Marshall in that regard. While there could have been fair reasons for Marshall not seeking physical therapy or pain management, including the cost or availability of such treatment options, *see* SSR 96-7p, the failure to question Marshall regarding why she did not seek physical therapy or pain management does not necessitate remand. *See Hoyt v. Colvin*, No. 13-1249, 2014 WL 444161, at *3 (7th Cir. Feb. 5, 2013) ("But even if that omission [in failing to address the claimant's explanation that he was unable to afford medical care] amounts to error, it does not undercut the ALJ's other valid reasons for discounting [the claimant's] testimony"); *McKinzey v. Astrue*, 641 F.3d 884, 890–91 (7th Cir. 2011) (finding credibility determination adequately supported by record, where ALJ failed to consider facially valid explanation for failure to obtain surgery).

Additionally, Marshall has provided no argument of what specifically would have changed in the RFC had the ALJ's credibility determination been different. *See Thomas v. Colvin*, No. 13-2602, 2014 WL 929150, at *3 (7th Cir. Mar. 11, 2014) (holding that errors in RFC determination were not harmless because "taking all of [claimant's] impairments together would result in a more restricted RFC than the ALJ formulated"). For instance, Marshall does not contend that she lacks the ability to perform "simple, routine, repetitive tasks" or cannot exercise "simple judgment" or have "brief and superficial interactions with co-workers." (Tr. 748.) This provides an additional basis to determine that any error in the ALJ's credibility determination in this case is harmless.

Here, the Court finds—even setting aside the portion of the credibility determination regarding Marshall's failure to seek physical therapy or pain management—that the ALJ's credibility determination was supported by the record and is not "patently wrong." Notably, there is substantial medical evidence inconsistent with Marshall's claims, as further supported by the improvement of her impairments with treatment and her daily activities. The rationale provided by the ALJ is, on the whole, reasonable and supported by the record. Accordingly, the Court will not remand on the basis of the ALJ's determination of Marshall's credibility.

**B.      Step Five Determination**

Marshall next contends that the ALJ erred at step five in relying on the jobs provided by the VE. Specifically, Marshall contends that the jobs provided by the VE fell within Reasoning Level 2 of the General Education Development ("GED") Scale of the Dictionary of Occupational Titles ("DOT"), when the hypotheticals posed by the ALJ should have warranted jobs at Reasoning Level 1. In response, the Commissioner argues that the ALJ did not err and that the ALJ reasonably relied on the VE.

The analysis at step five focuses on whether the claimant can make an adjustment to other work. 20 C.F.R. §§ 404.1520(a)(4)(v), (g). At step five, the ALJ considers numerous factors, such as the claimant's RFC, age, education, and work experience to see if the claimant can make an adjustment to other work. *Id.* If a claimant can make an adjustment to other work, the ALJ will find that the claimant is not disabled. *Id.* However, if the claimant cannot make an adjustment to other work, the ALJ will find that the claimant is disabled. *Id.*

SSR 00–4p requires ALJs to investigate and resolve any apparent conflict between the VE's testimony and the DOT. SSR 00–4p; *Weatherbee v. Astrue*, 649 F.3d 565, 570 (7th Cir. 2011) (citing *Overman v. Astrue*, 546 F.3d 456, 463 (7th Cir. 2008)). However, if the claimant's

counsel did not identify a conflict at the hearing, the claimant must "show that the conflict was 'obvious enough that the ALJ should have picked up on [it] without any assistance.'"  *Terry*, 580 F.3d at 478; *Barrett v. Barnhart*, 355 F.3d 1065, 1067 (7th Cir. 2004).  When there is an apparent conflict, the ALJ is required to obtain a reasonable explanation for the conflict.  *Terry*, 580 F.3d at 478.

Under the DOT, each job falls within one of several GED levels.  *Wiszowaty v. Astrue*, 861 F. Supp. 2d 924, 946 (N.D. Ind. 2012).  The GED Scale, which is composed of three divisions—Reasoning Development, Mathematical Development, and Language Development— concerns "those aspects of education (formal and informal) which are required of the worker for satisfactory job performance."  U.S. Dep't of Labor, Dictionary of Occupational Titles, app. C (4th ed. 1977, rev. 1991), *available at* http://www.oalj.dol.gov/public/dot/references/ dotappc.htm.  Jobs that fall within Reasoning Level 1 require that employees "Apply commonsense understanding to carry out simple one-or two-step instructions [and] Deal with standardized situations with occasional or no variables in or from these situations encountered on the job."  *Id.*  Reasoning Level 2 requires that employees "Apply commonsense understanding to carry out detailed but uninvolved written or oral instructions [and] Deal with problems involving a few concrete variables in or from standardized situations."  *Id.*

The Court is not persuaded that the ALJ erred in relying on the VE's testimony regarding available jobs consistent with Marshall's RFC.  First, the Court notes that district courts are divided on whether restrictions such as the one contained in Marshall's RFC are inconsistent with a job at Reasoning Level 2.[13]  Some courts have found that that a limitation to "simple

---

[13] The RFC in this case contains the following limitations relevant to the reasoning level required: "she is limited to work comprised of simple, routine, repetitive tasks . . . .  Additionally, the claimant is limited to work which does not require: . . . more than occasional and minor changes in work setting; more than the exercise of simple judgment."  (Tr. 748.)

tasks" is inconsistent with Reasoning Level 2. *Simms v. Astrue*, 599 F. Supp. 2d 988, 1007 (N.D. Ind. 2009) (citing cases from other circuits and explaining that "the identified jobs that require a GED reasoning level of 2 exceed Plaintiff's limitation to 'simple' tasks[] by requiring Plaintiff to carry out 'detailed' instructions"). Others have found that a limitation to "simple, routine" tasks do not preclude work at a Reasoning Level 2. *See, e.g., Thompkins v. Astrue*, No. 09c1339, 2010 WL 5071193, at *11 (N.D. Ill. 2010) (noting that "the Social Security Regulations and the DOT use markedly different standards for addressing a claimant's ability to understand, remember, and concentrate on job duties" and finding "Level 2 is not inconsistent with a claimant's limitation to simple, routine tasks."). The Seventh Circuit has not spoken on the exact issue of whether Reasoning Level 2 is consistent with this sort of RFC; however, the Seventh Circuit has considered Reasoning Level 3—one step more demanding than Reasoning Level 2—and found it could be consistent with "simple" tasks. *Terry*, 580 F.3d at 478; *Sawyer v. Colvin*, 512 F. App'x 603, 610–11 (7th Cir. 2013).

Even if there was a conflict between the VE's testimony and the DOT (which is not clear in this case), any error is harmless if Marshall is capable of performing a job at Reasoning Level 2. *Terry*, 580 F.3d at 478. Notably, Marshall has not argued that she cannot perform jobs at a Reasoning Level 2. Rather, the evidence shows that she has obtained a GED and the only relevant limitations placed upon her in the RFC—limitations with which she seems to affirmatively agree with in her brief before this Court—are to "simple, routine repetitive tasks" and to no more than "the exercise of simple judgment" and "brief and superficial interaction with co-workers." (Tr. 748.) Further, the consultative opinion of Dr. Gruen—which the ALJ gave significant weight (Tr. 752–53)—stated that Marshall's "thinking was logical and sequential" and determined that Marshall was capable of managing her own funds, but noted she could use

assistance in that regard. (Tr. 979.) The Court believes that this evidence supports Marshall's ability to perform work at a Reasoning Level 2, or at the very least is not so apparently in conflict with work at a Reasoning Level 2 that it was error for the ALJ not to inquire further of the VE. *Terry,* 580 F.3d at 478 (error is harmless if the conflict is not "obvious enough that the ALJ should have picked up on [it] without any assistance.").[14]

Because Marshall did not identify a conflict at the hearing, the ALJ's only duty was to inquire as to whether there was any conflict between the VE's testimony and the DOT. *See Prochaska*, 454 F.3d at 735 ("the adjudicator *has an affirmative responsibility* to ask about any possible conflict between that VE or VS evidence and information provided in the DOT." (quoting SSR 00-4p) (internal quotation marks omitted)). Here, the ALJ did just that. Specifically, towards the beginning of the VE's testimony, the ALJ asked "Do you understand that although I expect you to testify based upon your personal experience, education and training[,] I also want you to tell me any instances in which your testimony conflicts with the Dictionary of Occupational Titles[?]. (Tr. 804.) Such a question fulfills the ALJ's obligation under SSR 00-4p. *Weatherbee*, 649 F.3d at 570 (holding similar question to VE satisfies requirement to inquire about conflicts with DOT). Given the ALJ's fulfillment of his duty to inquire and the failure of Marshall to identify any claimed conflicts between the RFC and the jobs provided by the VE, the Court does not find that the ALJ erred in his step five determination.

---

[14] To the extent that Marshall argues that all work at a Reasoning Level 2 is inconsistent with "simple decision making," without regard to Marshall's specific abilities, the Court believes that such an argument is inconsistent with the analysis of *Terry*, which specifically focused on any inconsistency between the claimants' abilities and the applicable reasoning level. Additionally, such an argument is also contrary to those cases that have found that a limitation to "simple tasks" could be consistent with a reasoning level as high as Reasoning Level 3. *Terry*, 580 F.3d at 478; *Sawyer*, 512 F. App'x at 610–11; *Thompkins*, 2010 WL 5071193, at *11.

## VI.  Conclusion

For the foregoing reasons, the Commissioner's decision is **AFFIRMED**.  The Clerk is **DIRECTED** to enter judgment in favor of the Commissioner and against Plaintiff Nicole Marshall.

SO ORDERED.

ENTERED:  March 25, 2014

_____/s/ JON E. DEGUILIO_____
Judge
United States District Court